UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SECUNDIONO H. VILLARREAL,

                                    No. 18-11922

            Plaintiff,                District Judge Judith E. Levy

v.                                Magistrate Judge R. Steven Whalen

COMMISSIONER OF
SOCIAL SECURITY,

            Defendant.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Secundiono Villarreal ("Plaintiff") brings this action under 42 U.S.C. §405(g) challenging a final decision of Defendant Commissioner ("Defendant") denying his application for Disability Insurance Benefits ("DIB") under the Social Security Act. The parties have filed cross motions for summary judgment which have been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B). For the reasons set forth below, I recommend that Defendant's Motion for Summary Judgment be GRANTED [Docket #21] and that Plaintiff's Motion for Summary Judgment be DENIED [Docket #14].

## I.  PROCEDURAL HISTORY

Plaintiff applied for DIB on July 1, 2015, alleging disability as of March 25, 2012 (Tr. 171). After the initial denial of the claim, Plaintiff requested an administrative hearing,

held on April 7, 2017 in Livonia, Michigan before Administrative Law Judge ("ALJ") David

A. Mason, Jr. (Tr. 27).  Plaintiff, represented by attorney Barry Franklin Keller, testified, as

did vocational expert ("VE") Annette Holder (Tr. 31-50, 50-57).  On August 24, 2017, ALJ

Mason found that Plaintiff was not disabled (Tr. 10-21).  On April 18, 2018, the Appeals

Council denied review of the ALJ's determination (Tr. 1-3).  Plaintiff filed suit in this Court

on May 6, 2018.

## II.  BACKGROUND FACTS

Plaintiff, born August 27, 1966, was just short of his 51st birthday at the time of the

administrative determination (Tr. 21, 171).  He completed two years of college and

corrections academy training (Tr. 187).  He worked as a corrections officer, court officer, and

"screener" for the federal government (Tr. 188).  He alleges disability due to depression,

anxiety, diabetes, high blood pressure, and body aches (Tr. 186).

### A.  Plaintiff's Testimony

At the April 7, 2017 hearing, Plaintiff offered the following testimony:

Before ceasing work in May, 2012, he worked as a corrections officer at the

Shiawassee County Sheriff's Office (Tr. 31).  He was terminated in May, 2012 for the

inability to perform his work duties due to the health conditions of diabetes, high blood

pressure, anxiety, and depression (Tr. 32).  After the termination, he applied for work at

"several municipalities" but did not receive responses (Tr. 32).

The combination of anxiety attacks, high blood pressure, and diabetes caused him to

isolate from others (Tr. 33).  He stood 5' 10" and weighed 271 pounds (Tr. 33).  He was divorced and had a son, 12 (Tr. 34).  He was currently living in an apartment with his mother and supported himself with the proceeds of the sale of his house (Tr. 35).  He had a driver's license and drove 200 miles each weekend to pick up his son and drove altogether around three days a week (Tr. 35-36).

Plaintiff did not visit family or friends other than his son (Tr. 37).  He had a smart phone and used Facebook (Tr. 37).  He smoked around one pack of cigarettes each week (Tr. 37).  He stopped drinking about 18 months before the hearing but before that time was drinking two six-packs of beer every day (Tr. 38).

*Plaintiff's counsel interjected that Plaintiff received a settlement in 2014 from his former employer for violating his First Amendment rights but had since "squandered" the settlement* (Tr. 39-41).  *He stated prior to the settlement, Plaintiff had been traumatized by the removal of the guns in his house by the State Police and the Shiawassee County Sheriff's Department although he had not been charged with a crime* (Tr. 42-43).  *Counsel acknowledged that Plaintiff had experienced mental health problems as far back as 2007* (Tr. 43).

Plaintiff stated that he used the settlement proceeds to set up an education fund for his son, buy a car, pay bills, make back child support payments, and repay individuals who had lent him money (Tr. 41).

Plaintiff experienced medication side effects (Tr. 43).  On a scale of one to ten, he

experienced level "eight" back and joint pain with or without the recommended medication of Motrin (Tr. 43-44).  He used a heating pad for lower back pain (Tr. 46).  He had not undergone epidural injections (Tr. 44).  He was able to microwave simple meals, grocery shop, wash dishes, do laundry chores, take out the garbage, and vacuum (Tr. 45).  He did not perform lawn or garden work (Tr. 45).  He did not leave the house unless shopping, attending an appointment, or picking up his son (Tr. 46).  His sleeping habits were erratic (Tr. 46).  He could walk 30 yards, stand for five minutes, and sit for 30 (Tr. 47).  He could lift a gallon of milk and climb stairs with the use of handrail (Tr. 48).  He could bend far enough to touch his knees (Tr. 48).  He did not have problems using his hands (Tr. 48).

Plaintiff experienced memory and concentrational problems and difficulty being around others (Tr. 48).  He was unable to follow the plot of a television show (Tr. 48).  He was unable to understand or carry out basic instructions but could remember simple instructions (Tr. 48).

In response to questioning by his attorney, Plaintiff stated that he experienced the medication side effect of grinding his teeth and did not believe that his antidepressant/bipolar medications were working (Tr. 49).  He was unable to work due to lack of concentration, inability to communicate with others, and self isolation (Tr. 49).  He had daily anxiety attacks characterized by breathlessness and agitation (Tr. 49).  He would be unable to perform a production job due to his inability to focus or work with other individuals (Tr. 50).  He had "lost trust" in people (Tr. 50).

### B.  Medical Records[1]

### 1.  Treating Sources

### a. Records Predating the Alleged Onset of Disability Date of May 25, 2012

In August, 2007, Plaintiff reported the stressors of a marital separation, legal matters, finances, and work (Tr. 746).  He was assigned a GAF of 40 due to depression and marital stress[2] (Tr. 739). The following month, Plaintiff was assigned a GAF of 45[3] (Tr. 684). February, 2008 records note an improved mood despite continued marital problems (Tr. 706). June, 2010 counseling records note Plaintiff's report of depression and panic attacks (Tr. 719).  In April, 2011, Plaintiff reported that he was doing better and planned to start a GED program for prisoners (Tr. 670).   In June, 2011, Plaintiff reported excessive worry and reduced concentration (Tr. 709).

### b.  Records Created During the Relevant Period

January, 2012 psychiatric progress records note Plaintiff's report that he was doing

---

[1]Plaintiff's argument for remand pertaind only to Dr. Koenis-Forbis' October, 2015 consultative findings regarding the alleged psychological impairments (Tr. 464-471).  Therefore, the discussion of the medical records is limited to Plaintiff's psychological treatment.

[2]
A GAF score of 31 to 40 indicates "some impairment in reality testing or communication OR major impairment in several areas such as work, school, family relations, judgment, thinking or mood." *American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 2000) ("*DSM-IV-TR*"), 34.

[3]
A GAF score of 41–50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job.  *DSM-IV-TR* at 34.

well but was still having sleep problems (Tr. 251).  He exhibited a normal affect (Tr. 251).

The following month and in March, 2012, Plaintiff reported conflicts with his supervisor

leading to a suspension (Tr. 249-250, 642-643).   May, 2012 emergency records note

Plaintiff's report of panic attacks (Tr. 372, 380).   Plaintiff appeared fully oriented and

cooperative with a normal mood and affect (Tr. 381).  A CT of the head was unremarkable

(Tr. 386).  A drug screen was positive for opiates (Tr. 372).  Treating records note Plaintiff's

report of dizziness related to stress (Tr. 333).   The following month, Plaintiff sought

emergency treatment for insomnia (Tr. 392).  Emergency personnel notes state that Plaintiff

interacted appropriately with staff (Tr. 395).  September, 2012 records note continued job-

induced stress (Tr. 248).

April, 2013 treating records note that Plaintiff was pleasant and well groomed but

anxious due to financial, work, and housing stressors (Tr. 258-259).  June, 2013 records note

that Plaintiff was attempting to find work and was living with his mother (Tr. 255).

In January, 2015, Plaintiff reported intermittent symptoms of depression including

fatigue, appetite changes, low self esteem, and sleep disruptions, noting the contributing

factors of loss of employment, financial stress, a limited support network, and being

separated from his son (Tr. 265, 317).  He reported daily symptoms of anxiety (Tr. 266).

Plaintiff stated that he wanted to cut back on his alcohol use (Tr. 269).  The following month,

he endorsed symptoms of bipolar disorder (Tr. 274).  Plaintiff reported that he had recently

taken "an impulse trip to Texas" (Tr. 307, 611).  In March, 2015, psychiatrist Dosyng Yoon,

M.D. instructed Plaintiff to reduce the use of Celexa (Tr. 450).  Dr. Yoon noted normal concentrational abilities, a normal affect, and adequate judgment with a depressed mood (Tr. 445).  Dr. Yoon assigned Plaintiff a GAF of 45 due to bipolar I with psychosis, diabetes, and economic, housing, and psychosocial stressors (Tr. 448).   The following month, Plaintiff exhibited a normal memory and denied hallucinations (Tr. 437).  In May, 2015, Plaintiff reported good results from Ambien (Tr. 299, 600).  Dr. Yoon's records note that Plaintiff did not show symptoms of depression (Tr. 422).   June, 2015 imaging studies show normal left ventricular systolic function with grade I diastolic dysfunction with no significant valvular abnormality (Tr. 619).  In July, 2015, Abduh Zahurullah, M.D., noting a normal thought process and intact fund of knowledge, assigned Plaintiff a GAF of 55[4] (Tr. 409-411, 542). In September, 2015, Dr. Zahurullah observed adequate grooming and a normal attitude, mood, and affect (Tr. 458-459).  Plaintiff exhibited grossly intact memory, goal directed thought processes, and a normal thought content (Tr. 459).  The same month, Plaintiff sought emergency treatment for anxiety (Tr. 621).

In January, 2016, psychiatrist Asha Jain, M.D. noted a current prescription for Zoloft (Tr. 525).  Plaintiff reported anxiety and sleep disturbances but that he was doing "alright" (Tr. 519).  Plaintiff exhibited a normal memory and cooperative behavior (Tr. 521-522).  Dr. Jain assigned Plaintiff a GAF of 55 (Tr. 524).  In March, 2016, Dr. Zahurullah assigned

---

[4]A GAF score of 51 to 60 indicates moderate symptoms (occasional panic attacks) or moderate difficulty in social, occupational, or school functioning.  *DSM-IV-TR*, 34.

Plaintiff a GAF of 55, noting adequate impulse control and judgment (Tr. 514-519).  In May, 2016, Plaintiff exhibited good memory, awareness of current events, and goal directed thought processes (Tr. 495).  Dr. Zahurullah's September and November, 2016 records note full orientation, normal memory, and adequate judgment (Tr. 478-479, 488). In November, 2016, Plaintiff reported that he had been looking for work (Tr. 475).

### 2. Non-Treating Sources

In October, 2015, psychologist Nancy Koenig-Forbis, Ph.D. performed a one-time examination, noting that Plaintiff was able to drive himself to the appointment and arrived on time (Tr. 465).   Plaintiff reported a medical history of hypertension, diabetes, hyperlipidemia, and body aches (Tr. 465).  He reported that his medical problems started 10 years earlier, noting that he went through a divorce, declared bankruptcy, lost his house, and lost his job (Tr. 465).  He denied that the loss of his job in 2012 was due to depression (Tr. 466).  Plaintiff reported that he had since applied for work but opined that at the time of the examination he was unable to work (Tr. 466).  He reported that his emotional state caused body pain (Tr. 465).  He reported that he had trouble concentrating, following written and spoken instructions, and being around others due to depression, anxiety, and panic attacks (Tr. 465).  He reported low self esteem but denied that his symptoms were related to alcohol withdrawal (Tr. 466-467).  He reported that he was not motivated to bathe or groom himself regularly (Tr. 468).

Dr. Koenig-Forbis noted a history of urgent care treatment for panic attacks and

-8-

positive lab results for opiates (Tr. 467).  She noted no inpatient psychiatric hospitalizations and Plaintiff's denial of hallucinations, delusions, or paranoia (Tr. 467, 469).  She noted that Plaintiff had clear speech and an organized thought process (Tr. 469).  He appeared fully oriented with intact memory (Tr. 469-470).  Dr. Koenig-Forbis assigned Plaintiff a GAF of 45-50, as a result of depression, anxiety, panic attacks, a sleep disorder, alcohol abuse as well as personal, employment, and financial stressors (Tr. 471).  She recommended "[t]reatment for anxiety and depression and then finding some limited employment . . ." (Tr. 471).  She found that Plaintiff could manage his benefit funds (Tr. 471).

In October, 2015, Leonard C. Balunas, Ph.D. performed a non-examining review of the treating and consultative records, finding that as a result of depression and anxiety, Plaintiff experienced mild restriction in activities of daily living, and moderate difficulty in social functioning and maintaining concentration, persistence, or pace (Tr. 70-71).

## C. Vocational Testimony

VE Holder classified Plaintiff's former work as a corrections officer as exertionally heavy (as performed); court officer, medium; and airport screener, heavy to very heavy[5] (Tr.

---

[5]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools;  *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy*  work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. *Very Heavy* work requires "lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. § 404.1567(e).

-9-

52-53).   The VE stated that none of Plaintiff's former work had skills transferrable to sedentary work (Tr. 53).   The ALJ then described a hypothetical individual of Plaintiff's age, education, and work experience:

> This individual would be limited to [exertionally] medium one, two-step work. Simple routine, repetitive tasks and work environment - - this would be less than constant.   And a work environment free of fast paced production requirements, involving only simple work-related decisions.   Work free of any workplace changes, no team or tandem tasks, brief and superficial contact with co-workers, supervisors and the general public and this individual would be off task [eight percent of the workday] (Tr. 54).

The VE responded that the above limitations would preclude Plaintiff's past relevant work but would allow for the exertionally medium, unskilled work of a sorter (100,000 positions in the national economy) and machine tender (125,000) (Tr. 54-55).   The VE testified that if the above-described individual were limited to no temperature extremes or concentrated exposure to humidity, the job numbers would not change (Tr. 55-56).

The VE testified further that if the same individual were limited to exertionally light work with the additional limitations of only occasional ramps and stair climbing with the use of a handrail; no ladders, ropes, or scaffolds; occasionally balancing, stooping, kneeling, crouching, and crawling; moderate noise level; and no hazards such as unprotected heights or moving machinery, the individual could perform the exertionally light, unskilled work of a bench assembler (125,000); inspector (200,000); and packer (100,000) (Tr. 56).   The VE found that the need to be off task for up to 16 percent of the day due to panic attacks, or, the need to miss two days of work consistently every month would preclude all competitive work

-10-

(Tr. 56-57).

The VE stated that her testimony was consistent with the information found in the *Dictionary of Occupational Titles* ("*DOT*"), adding that her testimony pertaining to being off task and absenteeism was not addressed by the DOT and was based on her professional experience (Tr. 57).

### D. The ALJ's Decision

Citing the medical records, the ALJ found that Plaintiff experienced the severe impairments of "diabetes mellitus; hypertension; obesity; myalgia and myositis/pain disorder associated with psychological factors; major depressive disorder; bipolar disorder; generalized anxiety disorder; panic disorder; sleep disorder with insomnia; and alcohol dependence, in remission" but that none of the conditions met or medically equaled a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 12-13). The ALJ acknowledged a grade 1 diastolic dysfunction but found that the condition was non-severe (Tr. 13). The ALJ found that Plaintiff experienced mild limitation in understanding, remembering, or applying information and in adapting or managing himself and moderate limitation in interacting with others and in concentration, persistence, or pace (Tr. 13-14). The ALJ determined that Plaintiff had the Residual Functional Capacity ("RFC") for exertionally medium work with the following additional restrictions:

> [L]imited to one to two step work; simple, routine, and repetitive tasks (less than constant) in a work environment free of [f]ast pace production requirements involving only simple work related decisions with few, if any, work place changes; no team or tandem tasks; only brief and superficial

contact with co-workers, supervisors, and the general public; and he will be off
task eight percent of the workday (Tr. 15).

Citing the VE's testimony, the ALJ determined that while Plaintiff was unable to perform
any of his past relevant work, he could perform the exertionally medium, unskilled work of
a sorter and machine tender (Tr. 21, 54-55).

The ALJ discounted Plaintiff's alleged degree of limitation, noting that despite a
mood disorder, Plaintiff's mental status examination showed that his cognitive functioning
was intact with full orientation, intact memory, and adequate fund of knowledge and
concentration (Tr. 18).  The ALJ noted that Plaintiff had applied for security jobs following
his 2012 termination and was able to pay bills, sell a house, perform household chores, travel
to Texas, and live on his own (Tr. 18).  The ALJ found that Plaintiff's fairly wide variety of
activities supported the finding that he could perform a significant range of unskilled work
(Tr. 18).

### III.  STANDARD OF REVIEW

"Under the substantial evidence standard, a court looks to an existing administrative
record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual
determinations." *Biestek v. Berryhill*, — U.S. —, 139 S.Ct. 1148, 1154 (2019)(punctuation
altered)(*citing Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed.
126 (1938))(emphasis deleted).  The district court reviews the final decision of the
Commissioner to determine whether it is supported by substantial evidence.  *Biestek* at 139
S. Ct. at1152; 42 U.S.C. §405(g).  "Substantial evidence is defined as 'more than a scintilla

of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Commissioner of Social Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)(*citing Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir.1994)).

The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(*en banc*). Where substantial evidence supports the ALJ's decision, the reviewing court "defers to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Commissioner Of Social Sec.*, 581 F.3d 399, 406 (6th Cir. 2009)(*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.1997)).   However, in determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## IV.  FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected

to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## V. ANALYSIS

In his sole contention for remand, Plaintiff argues that the ALJ failed to credit or even acknowledge key portions of Dr. Nancy Koenig-Forbis' October, 2015 consultative examination.[6]  *Plaintiff's Brief,* 4-5, *Docket #14*, Page ID 795.  He contends that the ALJ erred by failing to "correctly interpret" her finding "that Plaintiff was disabled until he undertook counseling for his depression, anxiety, and agoraphobia." *Id.* (*citing* Tr. 471). Plaintiff also faults the ALJ for failing to acknowledge Dr. Koenig-Forbis' assignment of a GAF of 45 to 50, which reflects serious psychological symptoms.  *Id.* at 5; *see* fn 3, *above*.

---

[6]Plaintiff does not challenge the findings regarding his physical limitations. Further, my own review of the record shows that the ALJ's findings regarding the physical conditions are supported by substantial evidence.

The Dr. Koenig-Forbis' summary from which Plaintiff's argument is drawn is stated here in its entirety:

> Secundiono indicates he has tried to find work in his area of experience but [is] not successful yet.  He reports he feels physically poor as well as experiencing anxiety and depression that are a consequence of his multiple losses at this time.  Treatment for anxiety and depression and then finding some limited employment would seem to benefit Secundiono.  The mood difficulties need addressing in professional counseling (Tr. 471).

The ALJ addressed Dr. Koenig-Forbis' findings, noting that Plaintiff exhibited restlessness, low self esteem, and lost concentration while performing " serial sevens" (Tr. 18).   However, the ALJ noted that Plaintiff appeared fully oriented, was able to perform simple calculations correctly, and demonstrated adequate abstract thinking skills (Tr. 18). The ALJ acknowledged that  Dr. Koenig-Forbis assigned Plaintiff a GAF of 45 to 50 (Tr. 18).  He stated later in the determination that the GAF scores by the various sources were accorded only "some weight," noting that the record as a whole supported a finding of no more than moderate psychological limitation (Tr. 20).  He cited his own earlier finding that the psychological conditions did not meet or medically equal a listed impairment (Tr. 13-14, 20).   He observed that the psychiatric treating sources noted grossly intact memory, appropriate insight, and the ability to communicate his work and medical history (Tr. 13-14, 18).  The ALJ noted that Plaintiff could shop, pay off his debts, and maintain a Facebook page with approximately 60 online "friends" (Tr. 14).

For multiple reasons, Plaintiff's claim of error should be denied.  First Dr. Koenig-Forbis' comment that Plaintiff should seek treatment for anxiety and depression . . . then

-15-

find[] some limited employment" does not support Plaintiff's argument that he was disabled until after seeking treatment (Tr. 471). The "recommendation" is preceded by Dr. Koenig-Forbis' observation that Plaintiff was applying for work in his "area of expertise" (Tr. 471). The entire paragraph can be read to recommend "limited employment" over Plaintiff's former skilled or semiskilled jobs (Tr. 471). Her finding that Plaintiff could find success in less demanding work is consistent with the RFC for a range of unskilled work with limited interaction with others (Tr. 15). Even assuming that the consultative examiner believed that Plaintiff should seek treatment before working, she does not suggest that he required long-term treatment or that he was unable to work before completing treatment. Her comments cannot be read to state that Plaintiff's psychological limitations precluded all work. Further, her statement that Plaintiff would benefit from "limited employment" could be as easily interpreted to support the ALJ's determination that Plaintiff was not disabled. As such, Plaintiff's contention that the ALJ ignored a "disability opinion" is without merit.

Second, even assuming that Dr. Koenig-Forbis' findings could be construed as a disability opinion, the ALJ was not required to adopt the consultative source's "opinion." *See Gayheart v. Commissioner of Social Sec.,* 710 F.3d 365, 375 (6th Cir. 2013); 20 C.F.R. 1527(c)(1-2). Rather, as a one-time examining source, her opinion was "entitled to no special degree of deference." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994)(*citing Atterberry v. HHS*, 871 F.2d 567, 572 (6th Cir. 1989)). Further, the ALJ provided a lengthy and accurate summation of Dr. Koenig-Forbis' findings (Tr. 13-14, 18). Plaintiff's argument

that the ALJ failed to consider the consultative findings or erred by declining to adopt them is without merit.

Plaintiff's related argument that the ALJ failed to consider the low GAF score assigned by Dr. Koenig-Forbis or other sources also fails for multiple reasons. First, as discussed above, the ALJ addressed the GAF scores but noted that the treating records (showing intact judgment and good thought processes) supported the finding of no more than moderate psychological limitation (Tr. 20 *citing* Tr. 13-14). Further, it is well settled that the ALJ was not required to accord any weight to GAF scores. *See Kornecky v. Commissioner of Social Security*, 2006 WL 305648, *13 (6th Cir. February 9, 2006)(*citing Howard v. Commissioner of Social Security*, 276 F.3d 235, 241 (6th Cir. 2002) )("[W]e are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score in the first place"); *Jordan v. Commissioner of Social Security* , 2011 WL 891198, *5 (E.D. Mich. January 14, 2011)(GAF scores "subjective opinions, representing ... snapshot of a person's level of functioning at a given moment in time, not a rating of their ability to work").

Notably, while psychological treating records from 2007 include a GAF of 40 (impairment in reality testing, communication, or major impairment in work or family relations), Plaintiff was able to work full time during that period without apparent difficulty (Tr. 739). The GAF scores created during the relevant period fluctuate significantly over a relatively short period. Between March, 2015 and July, 2015, Plaintiff's GAF rose from a 45 (suggesting serious psychological limitation) to a 55 (moderate limitation) (Tr. 448, 409-

411, 542).  The ALJ did not err in according only "some weight" to the varying GAF scores.

In closing, my recommendation to uphold the Commissioner's decision on this application is not intended to trivialize the Plaintiff's personal problems or his degree of psychological limitations supported by the record.  Nonetheless,  the ALJ's determination that he is not disabled from all gainful employment is within the "zone of choice" accorded to the fact-finder at the administrative hearing level and should not be disturbed by this Court.  *Mullen v. Bowen*, *supra*.

## VI.   CONCLUSION

For these reasons, I recommend that Defendant's Motion for Summary Judgment [Docket #21] be GRANTED and that Plaintiff's Motion for Summary Judgment [Docket #14] be DENIED.

Any objections to this  Report and Recommendation must be filed  within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir.  1991); *United States v. Walters,* 638 F.2d 947 (6th Cir.  1981).  Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir.  1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir.  1987).

-18-

Any objections must be labeled as "Objection #1," "Objection #2," etc., and any objection must recite *precisely* the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party must file a concise response proportionate to the objections in length and complexity.  The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," *etc.*

s/R.  Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated:  August 5, 2019

---

## CERTIFICATE OF SERVICE

I hereby certify on August 5, 2019, that I electronically filed the foregoing paper with the Clerk of the Court sending notification of such filing to all counsel registered electronically. I hereby certify that a copy of this paper was mailed to non-registered ECF participants on August 5, 2019.

-19-